DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
TIMOTHY C. SAULSBURY (SBN 281434)
tsaulsbury@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:      415-236-6300

Nicholas Groombridge (*pro hac vice*)
Kira Davis (*pro hac vice*)
Josephine Young (*pro hac vice*)
Dana Vallera (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Attorneys for Plaintiff
COUNSYL, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| COUNSYL, INC., | Case No. 5:13-cv-04391-EJD |
| Plaintiff, | **PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(1), OR IN THE ALTERNATIVE, TO TRANSFER PLAINTIFF COUNSYL, INC.'S COMPLAINT FOR DECLARATORY JUDGMENT; AND MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)** |
| v. | |
| MYRIAD GENETICS, INC., | |
| Defendant. | |
| | Date:    April 4, 2014 |
| | Time:    9:00 a.m. |
| | Ctrm:    4 – 5th Floor |
| | Judge:   Honorable Edward J. Davila |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ....................................................................................................1

    A.    FACTUAL SUMMARY ................................................................................3

        1.    The development of the Counsyl BRCA test............................................3

        2.    Marketing of the Counsyl test and Myriad's knowledge of its existence...............4

        3.    Counsyl's contacts with the Northern District and lack of contact with Utah....................................................................................6

    B.    COUNSYL HAS STANDING TO BRING A DECLARATORY JUDGMENT ACTION .................................................................................7

        1.    Under *MedImmune*, declaratory judgment is proper here. ....................7

        2.    The prior decision in AMP does not change the analysis....................................11

    C.    The Court Should Deny Myriad's Bid to Transfer This Case to Utah .............12

        1.    Counsyl's choice of forum is entitled to significant deference...........................13

        2.    Myriad fails to carry its burden to show that transfer would serve the convenience of the parties and witnesses..............................................13

        3.    The interests of justice would be served by keeping the case in this District........15

        4.    The court most familiar with the issues is in New York, not Utah......................17

    D.    The Complaint States a Claim for Noninfringement .......................................17

i

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alien Technology Corp. v. Intermec, Inc.*,
No. 3:06-cv-51, 2007 WL 63989 (D.N.D. Jan. 4, 2007) ...................................................18

*Amini Innovation Corp. v. JS Imps. Inc.*,
497 F. Supp. 2d 1093 (C.D. Cal. 2007) ................................................................13, 14, 15

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
133 S. Ct. 2107 (2013)..................................................................................................7, 17

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
No. 09-cv-4515 (S.D.N.Y. filed May 2, 2009) .................................................................3

*Ass'n for Molecular Pathology v. USPTO*,
689 F.3d 1303 (Fed. Cir. 2012)....................................................................................7, 11

*Ass'n for Molecular Pathology v. USPTO*,
No. 09 Civ. 4515 (RWS) (S.D.N.Y. Dec. 23, 2009).................................................14, 17

*ASUSTeK Computer Inc. v. AFTG-TG LLC*,
No. 5:CV 11-00192-EJD, 2011 WL 6845791 (N.D. Cal. Dec. 29, 2011)........................18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................18

*Bohara v. Backus Hosp. Med. Benefit Plan*,
390 F. Supp. 2d 957 (C.D. Cal. 2005) ............................................................................13

*Boston Scientific Corp. v. Johnson & Johnson Inc.*,
532 F. Supp. 2d 648 (D. Del. 2008)................................................................................16

*Cepheid v. Roche Molecular Sys., Inc.*,
No. C-12-4411 EMC, 2013 WL 184125 (N.D. Cal. Jan. 17, 2013) ................................12

*Children's Network, LLC v. PixFusion, LLC*,
722 F. Supp. 2d 404 (S.D.N.Y. 2010).............................................................................16

*Cingular Wireless v. Freedom Wireless, Inc.*, No. CV06-1935 PHX JAT, 2007 WL
1876377 (D. Ariz. June 27, 2007)...................................................................................10

*ConnecTel, LLC v. Cisco Sys., Inc.*,
No. 2:04-CV-396, 2005 WL 366966 (E.D. Tex. Feb. 16, 2005)......................................16

*Cordance Corp. v. Amazon.com, Inc.*,
521 F. Supp. 2d 340 (D. Del. 2007)................................................................................18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1136 (Fed. Cir. 2013)........................................................................................8

*Elan Pharma Int'l Ltd. v. Lupin Ltd.*,
No. 09-1008 (JAG), 2010 WL 1372316 (D.N.J. Mar. 31, 2010) .....................................18

ii

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

*Fireman's Fund Ins. Co. v. National Bank for Coops.*,
   No. C 92-2667 BAC, 1993 WL 341274 (N.D. Cal. Aug. 27, 1993) ...................................13

*Gherebi v. Bush*,
   352 F.3d 1278 (9th Cir. 2003) .............................................................................................13

*Gompper v. VISX, Inc.*,
   298 F.3d 893, 898 (9th Cir. 2002) .......................................................................................19

*Interwoven, Inc. v. Vertical Computer Sys., Inc.*,
   No. C 10-4645 RS, 2011 WL 1642250 (N.D. Cal. May 2, 2011) ........................................15

*J2 Global Commc'ns, Inc. v. Protus IP Solutions*, Inc.,
   No. 6:08-cv-211, 2008 WL 5378010 (E.D. Tex. Dec. 23, 2008) ........................................16

*Jones v. GNC Franchising, Inc.*,
   211 F.3d 495 (9th Cir. 2000) ...............................................................................................13

*McZeal v. Sprint Nextel Corp.*,
   501 F.3d 1354 (Fed. Cir. 2007).............................................................................................18

*MedImmune, Inc. v. Genentech Inc.*,
   549 U.S. 118 (2007) ...................................................................................................... passim

*MedImmune, LLC v. PDL BioPharma, Inc.*,
   No. 08-5590 JF (HRL), 2009 WL 1011519 (N.D. Cal. Apr. 14, 2009) ...............................16

*Micron Tech., Inc. v. Mosaid Techs.*,
   518 F.3d 897 (Fed. Cir. 2008)...............................................................................................10

*Microsoft Corp. v. Phoenix Solutions, Inc.*,
   741 F. Supp. 2d 1156 (C.D. Cal. 2010) ...........................................................................17, 18

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   No. C 07-2363 CW, 2008 WL 3266647 (N.D. Cal. Aug. 6, 2008) ......................................10

*Panavise Prods., Inc. v. National Prods., Inc.*,
   306 F. App'x 570 (Fed. Cir. 2009) .......................................................................................12

*Polich v. Burlington N., Inc.*,
   942 F.2d 1467 (9th Cir. 1991) ..............................................................................................19

*Prasco, LLC v. Medicis Pharm. Corp.*,
   537 F.3d 1329 (Fed. Cir. 2008)..............................................................................................12

*Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., L.L.C.*,
   No. C-06-4693 (JCS), 2006 WL 3290416 (N.D. Cal. Nov. 13, 2006) ................................13

*Societe de Conditionnement en Aluminium v. Hunter Eng'g*,
   665 F.2d 938 (9th Cir. 1981) ................................................................................................11

*STX, Inc. v. Trik Stik, Inc.*,
   708 F. Supp. 1551 (N.D. Cal. 1988) .....................................................................................14

*Under Sea Indus., Inc. v. Dacor Corp.*,
   833 F.2d 1551 (Fed. Cir. 1987)..............................................................................................18

iii

*Univ. of Utah Research Found. v. Ambry Genetics Corp.*,
   No. 2:13-cv-00640-RJS (D. Utah July 29, 2013) ...............................................................17

*Univ. of Utah Research Found. v. Ambry Genetics Corp.*,
   No. 2:13-cv-00640-RJS (D. Utah July 9, 2013) ........................................................... passim

*Univ. of Utah Research Found. v. Invitae Corp.*,
   No. 2:13-cv-01049-EJF (D. Utah Nov. 25, 2013) ..............................................................7

*Univ. of Utah Research Found. v. Lab. Corp. of Am. Holdings*,
   No. 2:13-cv-01069-BCW (D. Utah Dec. 3, 2013) ..............................................................7

**Statutes**

28 U.S.C. § 1404........................................................................................................................12

**Rules**

Fed. R. Civ. P. 12(b)(6).............................................................................................................17

Fed. R. Civ. P. 8........................................................................................................................18

## I.    INTRODUCTION

Myriad's Motion to Dismiss is remarkable for two statements:  one that typically appears in a motion challenging declaratory relief standing, but does not here, and a second statement that *does* appear in Myriad's brief, but is simply not true.

*First*, although Myriad challenges Counsyl's assertion of a basis for seeking declaratory relief, nowhere does Myriad state that it does *not* intend to sue Counsyl.  Under *MedImmune*, an express threat of suit is no longer required for declaratory relief.  But when one challenges a declaratory relief action, one typically denies an immediate intent to bring suit.  Myriad does not make that statement because it can't:  its consistent campaign to sue BRCA test competitors, coupled with its express professions of irreparable harm should *any* competitor reach market during the final years of Myriad's patents, make clear that, in the absence of this action, Myriad would add Counsyl to the list of defendants at some point.

Myriad's view of the breadth of its portfolio is similarly expansive, and inevitably encompasses Counsyl's test.  As it touts in its pending litigation in Utah, although the Supreme Court recently invalidated five of Myriad's patent claims, that merely "reduc[ed Myriad's] overall patent estate to 24 patents and 515 patent claims."  Pls.' Mem. Supp. Prelim. Inj. at 1, *Univ. of Utah Research Found. v. Ambry Genetics Corp.*, No. 2:13-cv-00640-RJS (D. Utah July 9, 2013), ECF No. 5.  In that motion, Myriad argues that the defendant will likely be found to infringe because "Ambry's test requisition form . . . lists a number of test panels or other tests that include testing the BRCA1 and BRCA2 genes." *Id.* at 15.  In Myriad's view, if you have a BRCA test, you infringe, period.

The *second* remarkable statement is Myriad's claim that, until Counsyl filed this action, Myriad had no idea Counsyl even had or was developing a BRCA product.  In fact, Myriad had become aware of Counsyl's existence well before Counsyl brought this case.  We know this from multiple sources.  In mid-August 2013, a major HMO[1] conducted an auction among eight BRCA test vendors, and sent communications to those vendors via four separate emails, each of which inadvertently disclosed all of

---

[1] Due to confidentiality obligations, Counsyl cannot publicly disclose the identity of the entity in question.  Details of this incident are contained in the sealed Declaration of Rob Guigley ("Guigley Decl.") filed concurrently herewith.

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

the recipients' identities to each other.  Because the rules of that auction required each vendor to have a commercially available product, by at least as early as August 19, 2013, Myriad knew Counsyl was in the market.

The previous week, Counsyl's website began getting scores of hits from computers at Myriad, far in excess of previous traffic.  Even earlier, starting in mid-June, Counsyl had begun marketing its forthcoming BRCA test to major health care providers, who typically would then ask Myriad for competing proposals and bids.  And on September 13, 2013, a Myriad employee called a recently departed Counsyl employee, apparently unaware that she had left the company, and asked her about Counsyl's BRCA product.

In short, Myriad was well aware of Counsyl's BRCA test, and had made clear by both words and actions that it intended to sue any competitors in an effort to maintain its monopoly pricing on BRCA testing.  Under *MedImmune*, those facts easily establish standing to bring a declaratory relief motion.

Myriad's alternative request, to transfer this action to Utah, should be rejected out of hand.  There is no dispute that Counsyl has no relevant contacts with Utah, apart from the fact that it sells *other*, unrelated products nationwide.  Counsyl has no personnel in Utah, has no facilities in Utah, and has never marketed, offered for sale, or sold the allegedly infringing BRCA test in Utah.  All of the personnel who developed Counsyl's product, all of the documentation of its development and testing, and all of Counsyl's operations and facilities are in this District.

Myriad, of course, is in Utah, but that is not enough to displace a Plaintiff's choice of forum. Myriad instead bases its transfer argument primarily on the proposition that, because two[2] Myriad patent cases are currently pending there, "Judge Shelby in the District of Utah has considerable expertise with the subject matter of this litigation . . . ."  Def.'s Mot. to Dismiss or Transfer 12 ("Mot."), Nov. 1, 2013, ECF No. 26.

But compare this to what Myriad told *Judge Shelby himself* only a few months ago, in its motion for leave to file an overlength brief in one of those two cases:

---

[2] Since filing its motion, Myriad has sued yet another California-based BRCA test supplier, as well as a North Carolina-based vendor, both in Utah.

> In the opinion of counsel, the filing of an overlength memorandum is necessary.  Plaintiffs' Motion addresses infringement of multiple claims of six patents **involving an area of technology likely unfamiliar to the Court**.

Pls.' Mem. Supp. Overlength Mot. Prelim. Inj. at 2, *Univ. of Utah Research Found. v. Ambry Genetics Corp.*, No. 2:13-cv-00640-RJS (D. Utah July 9, 2013), ECF No. 5 (emphasis added).

If prior judicial experience with the patents at issue is to be the deciding factor, as Myriad asserts, there is a judge with extensive experience presiding over Myriad's claims of infringement, but he isn't in Utah.  The *original* Myriad case, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, No. 09-cv-4515 (S.D.N.Y. filed May 2, 2009), has been pending before Judge Robert W. Sweet in the Southern District of New York for nearly five years, where it was litigated through summary judgment, and thence to the Federal Circuit and the United States Supreme Court.  Presumably, once the Federal Circuit's mandate issues, the case will return to his court.  Judge Sweet is singularly familiar with the issues and patents in suit.  Thus, if judicial efficiency and experience are to decide venue, New York—not Utah—is the logical choice.

## A.   FACTUAL SUMMARY

### 1.   The development of the Counsyl BRCA test.

Counsyl is a small technology firm in South San Francisco, founded in 2007.  Declaration of Eric Evans ("Evans Decl.") ¶ 2.  Counsyl is one of the first biotechnology companies to utilize large-scale applications of genomics in medicine.  In the spring of 2009, Counsyl's lab received its first regulatory approval in the U.S. and began offering its carrier screening tests.  In 2010, Counsyl won the Wall Street Journal's Innovation Award for Medicine.  *Id.*  At least as early as September 2011, Counsyl discussed offering BRCA testing.  Thus, when Counsyl invested in its initial large-scale genetic tests using modified next generation sequencing technology, Counsyl made sure that the tests could be readily adapted to perform BRCA testing as well.  *Id.* ¶ 3.

In early March, 2013, Counsyl began active development of its BRCA tests.  Declaration of Shivani Nazareth ("Nazareth Decl.") ¶¶ 2-3; Declaration of Kaylene Ready ("Ready Decl.") ¶ 3; Evans Decl. ¶ 5.  By April 5, 2013, Counsyl had decided on which portions of the BRCA genome it would sequence for its BRCA test, including methods of detection of deletion and duplication variants, and had

3

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

designed and ordered the synthesis of its first set of BRCA test reagents.  Evans Decl. ¶ 7.  By June 2013, Counsyl used its prototype sequencing method to perform a series of BRCA tests that utilized the BRCA test reagents that it had designed, as well as software that it had created, to sequence BRCA samples with certain known BRCA mutations obtained from sources outside of the United States.  *Id.* ¶ 8.  On August 27, 2013, Counsyl approved its standard operative procedure for its BRCA tests.  On September 6, 2013, the first test order was placed.  And, on September 18, 2013, the first production batch of Counsyl's BRCA tests was created.  *Id.* ¶ 9.

As part of the development of Counsyl's BRCA test product, once the product was ready for deployment, Counsyl conducted an in-house "screening event," where Counsyl tested the product and the associated review and genetic counseling on 65 Counsyl employee volunteers.  The event was designed to replicate the entire testing and counseling flow, simulating real-world conditions.  That testing was conducted on September 6, 2013.  The product performed as expected, and no significant changes to the product or the process were indicated as a result of this testing.  The BRCA test used in the internal testing is functionally identical to the test currently being marketed.  Declaration of Kenny Wong ("Wong Decl.") ¶¶ 3-5; Ready Decl. ¶ 6.

### 2. Marketing of the Counsyl test and Myriad's knowledge of its existence.

Meanwhile, Counsyl began the process of marketing its BRCA test to physicians, hospitals, and insurers.  In May, 2013, Counsyl's BRCA Product Manager spoke and then met with a doctor at the MD Anderson Cancer Center in Houston, Texas to discuss conducting a validation study there.  One of the genetic counselors attending that meeting is a close personal friend with Myriad's local Regional Medical Specialist.  Ready Decl. ¶ 4.  On June 18, 2013, Counsyl initiated a "soft offering" of its BRCA test.  Over the next month, Counsyl reached out to at least eight prominent physicians and physician groups to offer its BRCA tests and related genetic counseling services.  *Id.* ¶ 5.

On June 18, 2013, Counsyl also began marketing its BRCA test to about 50 to 60 major health plans and strategic accounts, including major insurers, major HMOs, and large hospitals.  Declaration of Rob Guigley ("Guigley Decl.") ¶¶ 3-4 & Ex. A.  Among those major customers was a major HMO.  On August 6, 2013, that HMO decided to put its national BRCA test purchasing through a Request for Proposal ("RFP").  Guigley Decl. ¶ 4.

4

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

1    That RFP process consisted of two phases, the first of which was an online "reverse auction"

2    pricing process.  It was Counsyl's original understanding, based on conversations with the HMO's

3    personnel, that the process was supposed to be blind (*i.e.*, each bidder knew only the number of

4    anonymous competitors).  Eight potential BRCA test suppliers were invited to participate in that process.

5    Although Counsyl believed the auction process was supposed to be blind, each of the bidders was

6    identified to the others.  On August 19, 2013, the day before the mock auction, the HMO emailed

7    instructions and forms to each of the eight participants.  However, those materials were sent in a single

8    email, with all of the recipients exposed on the "To:" line.  As a result, Counsyl learned who its seven

9    competitors in the bidding process were.  So did the other seven participants, one of whom was Myriad.

10   The exposure was compounded by sending at least three more emails to the whole group between August

11   19, 2013 and August 22, 2013, each of which disclosed to each of the participants the identities of the

12   other seven companies, including Counsyl.  *Id.* ¶¶ 5-6.

13   One of the express requirements for participation in that RFP process was that the bidders had to

14   have a currently-available commercial product.  Although Counsyl had not yet provided commercial

15   access to its BRCA test, it planned to (and in fact did) before completion of the RFP process.

16   Accordingly, Counsyl asked the HMO to agree to grant Counsyl an exception to that requirement and

17   allow Counsyl to participate.  The HMO agreed.  Guigley Decl. ¶ 7.  As a result of that process, Myriad

18   was thus aware that Counsyl was in the market with what Myriad had to assume was a commercially

19   ready BRCA test.

20   In fact, Myriad apparently was already aware of Counsyl's BRCA test *before* the major HMO

21   bidding process, via any of a number of channels.  As noted above, Counsyl began actively marketing its

22   product to both doctors and large institutions in June 2013.  It is typical for such customers to react to

23   sale proposals by seeking comment or competing bids from other suppliers (in this case, Myriad).

24   Guigley Decl. ¶ 10.  At least one potential customer expressly told Counsyl it would reach out to Myriad

25   for comment on the Counsyl test.  Ready Decl. ¶¶ 14-15.

26   As a result, Myriad began looking into Counsyl's BRCA test.   In mid-August, the Counsyl

27   website experienced a dramatic spike in "hits" originating from Myriad's IP address.  Evans Decl. ¶ 14 &

28   Ex. A.  And on September 13, 2013, a Myriad employee called a former Counsyl employee (apparently

1   under the impression she still worked for Counsyl), told her that Myriad had heard of Counsyl's BRCA

2   test, and was described by her as "fishing" for details.  Wong Decl. ¶ 6 & Ex. B.

3          Counsyl has devoted, and is continuing to devote, considerable resources to the marketing of its

4   BRCA test.  The commercial team is devoting a majority of its total sales efforts to the BRCA test, and

5   as of mid-November had already entered into contracts to supply the test to three major customers.

6   Guigley Decl. ¶¶ 8-9.  Counsyl has also received orders from several prominent physicians, and currently

7   has dozens of sales representatives marketing Counsyl's BRCA test to physicians and physician groups.

8   In addition, Counsyl has two genetic counselors dedicated to providing counseling services to BRCA test

9   patients, as well as two additional genetic counselors who also provide counseling services to BRCA test

10  patients.  Ready Decl. ¶¶ 7-9.

11            **3.      Counsyl's contacts with the Northern District and lack of contact with Utah.**

12         Counsyl is located in South San Francisco, California.  Evans Decl. ¶ 2.  With the exception of

13  one software developer based in Poland, the design and development of Counsyl's BRCA tests were

14  done solely in South San Francisco, California.  The pre-launch work-up of Counsyl's BRCA tests was

15  done solely in South San Francisco, California.  The initial testing of numerous Counsyl's employees

16  was done solely in South San Francisco, California.  *Id.* ¶ 10.

17         In addition, Counsyl employs genetic counselors related to its BRCA tests, who are based in

18  South San Francisco, California, as well as in Texas and the New Jersey/New York areas.  Counsyl

19  employs a sales force to market it BRCA tests on the East and West Coasts, the Midwest (*i.e.*, North

20  Central) and the South.  *Id.* ¶ 11.

21         Counsyl has no facilities, no sale representatives, and no other employees in Utah, and no plans to

22  hire any employees in Utah.  *Id.* ¶ 12; Ready Decl. ¶ 10.  Counsyl has not made any sales of its BRCA

23  test in Utah.  Ready Decl. ¶ 11.

24         Counsyl does, however, have eleven employees in the New York/New Jersey area, nine of whom

25  are involved in Counsyl's BRCA test business.  *Id.* ¶ 12.  Counsyl has marketed (and continues to

26  market) its BRCA test to numerous physicians and academics in the New York/New Jersey area, and has

27  applied for and received provisional approval for its BRCA test from the New York Department of State.

28  Nazareth Decl. ¶¶ 5-10.

6

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

1

2

**B.      COUNSYL HAS STANDING TO BRING A DECLARATORY JUDGMENT
ACTION**

3

**1.      Under *MedImmune*, declaratory judgment is proper here.**

4

The days of hanging the sword of Damocles over a competitor's head, by the simple expedient of

5

avoiding a direct threat of suit, are over.  In the wake of *MedImmune, Inc. v. Genentech Inc.*, 549 U.S.

6

118 (2007), and subsequent Federal Circuit law applying it, no direct threat, demand for licensing, or

7

other imminent apprehension of suit is required for Article III standing in a declaratory relief action.

8

Rather, as Myriad itself notes, "a declaratory judgment plaintiff must allege both (1) an affirmative act by

9

the patentee related to the enforcement of his patent rights, and (2) meaningful preparation to conduct

10

potentially infringing activity." *Ass'n for Molecular Pathology v. USPTO*, 689 F.3d 1303, 1318 (Fed.

11

Cir. 2012), *overruled on other grounds by Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133

12

S. Ct. 2107 (2013).

13

Both prongs of this test are easily met here.  *First*, Myriad's conduct since the Supreme Court

14

ruling has been nothing *but* a consistent string of "affirmative act[s] by the patentee related to the

15

enforcement of [its] patent rights."  One after another, competitors that announce a competing BRCA test

16

are sued by Myriad.  Ambry Genetics Corp. ("Ambry") announced their intent to market a test (a test not

17

yet on the market).  Myriad sued Ambry in Utah.  Gene by Gene, Ltd. announced its own intention to

18

bring a BRCA test to market.  Myriad sued Gene by Gene in Utah.  GeneDX brought a BRCA test to

19

market.  Myriad sued GeneDX in Utah.  Quest Diagnostics launched BRCA testing, and Myriad sued

20

Quest in Utah, notwithstanding Quest having already brought a declaratory judgment action five days

21

earlier in the Central District of California.  After Myriad filed this motion, on November 25, 2013,

22

Myriad sued yet another Northern California-based BRCA test manufacturer, Invitae Corporation, again

23

in Utah.  Compl., *Univ. of Utah Research Found. v. Invitae Corp.*, No. 2:13-cv-01049-EJF (D. Utah Nov.

24

25, 2013), ECF No. 2.  And on December 3, 2013, Myriad sued North Carolina-based Laboratory

25

Corporation of America Holdings ("LabCorp"), the day after it began offering BRCA1 and BRCA2

26

testing, yet again in Utah.  Compl., *Univ. of Utah Research Found. v. Lab. Corp. of Am. Holdings*, No.

27

2:13-cv-01069-BCW (D. Utah Dec. 3, 2013), ECF No. 2.

28

7

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

In short, Myriad has established a pattern of suing competitors who even propose to bring a competing BRCA test to market during the life of its patents.  Myriad makes no secret of that intention, or the reasons it believes it has no choice but to do so.  In support of its motion for a preliminary injunction against Ambry and Gene by Gene, Myriad explained that "[u]ntil a couple of weeks ago, Myriad was the only company that offered a full sequence test for the BRCA1 and 2 genes in the United States," and that "[n]o other entity in the United States has been licensed to perform full sequencing of the BRCA1 and 2 genes."  Pl.'s Mem. Supp. Prelim. Inj. at 31 & n.16.  Myriad doesn't pick and choose whom to sue, license, or ignore:  it sues everyone it can.  Nor does Myriad make a secret of the rationale to this strategy, arguing that the entry of *any* competitor in the market will cause Myriad irreparable harm:

> If Ambry is allowed to proceed, market prices will decline. This is largely because third-party payors (such as insurers and/or HMO's) are primarily responsible for deciding whether they will reimburse or pay for testing, rather than the physician or the patient.  Those payors will exert pressure on Myriad to lower its prices in response to Ambry, and Myriad would be forced to do so in some instances.  This could lead to a competitive response by Ambry and even lower market prices. Additionally, **other competitors potentially could enter the market at even lower prices.** As a consequence, Myriad's market share will decline to the extent it does not match Ambry's lower price. In either case, Myriad will lose significant amounts of revenue.
>
> . . .
>
> The foregoing damage to Myriad only will be compounded by the fact that Ambry is not likely to be the only entrant to the market.  **If other infringers enter, the barriers to obtaining damages will become even more challenging because of the difficulty in tracing the cause of Myriad's lower prices to any single defendant**.

*Id.* at 32, 33 n.17 (emphasis added) (internal citations omitted).

Myriad further justifies its irreparable harm argument in that case by again emphasizing that it has never, and will never, license its patents to anyone:  "The fact that Myriad has not licensed to **any other party** the rights to the patents at issue to do full BRCA1 and BRCA2 testing further favors a finding of irreparable harm. *Douglas Dynamics, LLC*, 2013 WL 2158423 at * 6 (fact patentee 'had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity' weighed in favor of entry of injunctive relief)."  *Id.* at 36 n.18 (emphasis added).

8

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

Myriad has made clear that it believes it has no choice but to sue every potential competitor.  As Myriad explains, its future plans are critically dependent on excluding *any* competitor from the market, so that it can leverage its remaining years of exclusivity to gain market share for its next product family:

> And, Myriad has had no time or opportunity to distinguish its BRAC*Analysis*® test and associated testing quality from competitors as it would if its competitors were barred from entry until the patents' expiration.  Myriad is well aware that its patents will eventually expire, and has begun to formulate a marketing strategy to advise the public of the superiority of its BRAC*Analysis*® test.  However, Myriad relied on the premise that it still had the benefit of a few years of patent exclusivity to finalize this strategy.  It is not prepared to implement those plans immediately, which it would need to do in order to combat the effect of Ambry's testing.
>
> . . .
>
> Furthermore, Myriad has formulated a corporate strategy for its remaining years of patent exclusivity, including the development and introduction of new and beneficial products, such as Myriad's MyRisk™ hereditary cancer test.  This multi-gene panel, which will be introduced later this year, will offer testing of 25 different genes in six different cancers, including the BRCA genes.  Myriad rightly expected that this advanced test would be brought to market during the remaining patent term, thus allowing Myriad and its investors the full benefit of market development for that multi-gene panel.

*Id.* at 38-40 (internal citations omitted).[3]  Against this backdrop, it defies logic to suggest that Myriad would forego suing Counsyl, and Myriad offers no reason to believe otherwise.

The second prong of the *MedImmune* test, "meaningful preparation to conduct potentially infringing activity," is also easily met here.  Despite Myriad's professions of ignorance, Counsyl has done far more than simply express a plan to offer an unspecified BRCA test in the future.  It began work on its test in March 2013.  It has completed the design and development and used the test on scores of test subjects, and is in full commercial production.  It has invested heavily in the development and marketing of its test, dedicating dozens of sales representatives to marketing to physicians and a majority of its total Health Plans effort to marketing the BRCA test to major institutions.  It has begun offering the

---

[3] Myriad echoed this theme in reply:  "Finally, Myriad explained that allowing Defendants to enter the market will result in non-compensable damage to Myriad's reputation.  This is because Myriad was the only provider of genetic predisposition testing for breast and ovarian cancer until a few months ago, and thus providers and patients naturally associate the test with Myriad."  Pls.' Reply Mem. Supp. Prelim. Inj. at 124, *Univ. of Utah Research Found. v. Ambry Genetics Corp.*, No. 2:13-cv-00640-RJS (D. Utah Aug. 31, 2013), ECF No. 98.

test for sale to scores of major customers, and entered into contracts to supply the test to at least three of them.

Nor was Myriad ignorant of Counsyl's development. One of Counsyl's sales efforts was a mid-August competitive bidding process for a major HMO, where Counsyl competed head-to-head against Myriad and others. Each participant (including Myriad) was able to see the identity of each other bidder (including Counsyl). Shortly before bidding, in mid-August, Counsyl's website started receiving multiple daily hits from Myriad's IP address. A former Counsyl employee received a probing phone call from a friend at Myriad.

Counsyl was thus far beyond "meaningful preparation" to conduct potentially infringing activity: it was in the marketplace, offering for sale and contracting to sell its BRCA test, with Myriad's knowledge. In such circumstances, declaratory judgment lies. Indeed, in *Micron Tech., Inc. v. Mosaid Techs.*, 518 F.3d 897, 901 (Fed. Cir. 2008), the Federal Circuit noted that the absence of an imminent threat meant little where—as here—"Micron watched MOSAID sue each of the other leading DRAM manufacturers." The court also noted that "recent public statements and annual reports also confirm [MOSAID's] intent to continue an aggressive litigation strategy." As the *Micron* court concluded, "[t]he Declaratory Judgment Act exists precisely for situations such as this." *Id.* at 902.

Similarly, in *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, No. C 07-2363 CW, 2008 WL 3266647, at *4 (N.D. Cal. Aug. 6, 2008), this Court recognized that an established pattern of aggressive litigation over the same patents established declaratory judgment jurisdiction *even in the face of a covenant not to sue* arising out of prior litigation between the parties:

> O2 Micro has sued numerous parties, including MPS, accusing them of infringing the #129 patent. Such suits indicate "an assertion of rights and a willingness to pursue litigation" regarding the patent-in-suit, *Cingular Wireless v. Freedom Wireless, Inc.*, 2007 WL 1876377, at *3 (D. Ariz.), and there is no reason to believe that O2 Micro has decided to stop vigorously enforcing its patent rights.

And even before *MedImmune*, this Circuit recognized that where—as here—"the plaintiff is engaged in the on-going manufacture of the alleged patented item, the showing of real and reasonable apprehension beyond the manufacture of the patented item need not be substantial. . . . When the plaintiff . . . is an actual manufacturer of a product that may infringe the patent owned by another, the adverse

1  legal positions of the parties are more crystallized and the possibility that the court will be asked to

2  render an advisory opinion on a set of hypothetical facts is minimized." *Societe de Conditionnement en*

3  *Aluminium v. Hunter Eng'g*, 665 F.2d 938, 944 (9th Cir. 1981).  Counsyl is selling a finished product in a

4  market where Myriad has announced that it must sue *any* competitor.  Myriad's claim that Counsyl

5  "seeks an advisory opinion" because "at some point in the future, Counsyl wants to conduct BRCA

6  testing and is afraid Myriad will sue it" (Mot. 9-10) is in substantial tension with the facts.

### 2.    The prior decision in AMP does not change the analysis.

8         Myriad bases its Motion almost entirely on the Federal Circuit's prior decision in Myriad's own

9  case, *AMP*, 689 F.3d 1303.  In that case, three plaintiffs brought declaratory judgment actions of

10  noninfringement of the patents at issue here.  The Federal Circuit found that two of the three did not have

11  standing, but the third did.  Myriad suggests that *AMP* controls here:  "the Federal Circuit has already

12  determined that a declaratory judgment plaintiff like Counsyl, *with no test available to assess*

13  *infringement . . .* " cannot have standing.  Mot. 7 (emphasis added).  But of course, that argument is based

14  on fallacy:  Counsyl has a test, which is already on the market.  The rejected plaintiffs in *AMP*, by

15  contrast, alleged "only that they will 'consider' resuming BRCA testing.  These 'some day' intentions are

16  insufficient to support an 'actual or imminent' injury."  *AMP* at 1321.

17         Critically, the court found that Dr. Ostrer *had* standing, notwithstanding Myriad's arguments that

18  (1) it had not communicated with him in ten years, (2) he was not currently offering testing (although he

19  was prepared to do so), and (3) in the interim Myriad had not sued anyone else either.  *Id.* at 1319.  The

20  court noted that Myriad's ten-year-prior "active enforcement of its patent rights forced Dr. Ostrer, as well

21  as every other similarly situated researcher and institution, to cease performing the challenged BRCA

22  testing services, leaving Myriad as the sole provider of BRCA clinical testing to patients in the United

23  States.  Since that time, neither the accused activities nor the parties' positions have changed."  *Id.* at

24  1321.

25         Now, by contrast, Myriad's known universal campaign of enforcement isn't ten years old:  It is

26  current.  Similarly, the declaratory relief plaintiff isn't merely "prepared" to offer an allegedly infringing

27  product, it has done so.  Under *AMP*, if Dr. Ostrer had standing, Counsyl certainly does.

28

Myriad's reliance on *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1339 (Fed. Cir. 2008), is even farther misplaced.  In *Prasco*, a cleaning product manufacturer (Prasco) sought declaratory judgment that its product did not infringe a competitor's (Medicis') patent.  Medici had not threatened Prasco with suit or communicated about the patent in any way, and it had never sued anyone else on the patent-in-suit.  Neither did Prasco yet have a product on sale.  The *sole* bases asserted for the existence of a case or controversy were (1) that Medicis had sued Prasco several years earlier alleging infringement of a different patent by a different product, and (2) Medicis marked its own products with the relevant patent numbers.  Not surprisingly, the district court found no jurisdiction, and the Federal Circuit affirmed.  *Id.* at 1337-42.

Neither does the unpublished opinion in *Panavise Prods., Inc. v. National Prods., Inc.*, 306 F. App'x 570 (Fed. Cir. 2009), support Myriad's position.  To the contrary, the *Panavise* court made clear that "[w]e do not, of course, mean that the lack of direct pre-complaint communication between a patentee and a declaratory plaintiff by itself is sufficient to defeat subject matter jurisdiction."  *Id.* at 573. Rather, the *Panavise* court rejected jurisdiction primarily because, although NPI had sued other manufacturers in the past under the same patent, Panavise had been selling a "substantially identical" product for twelve years, but "NPI has yet to accuse Panvise of infringement or take any actions which may imply such allegation."  *Id.*[4]

## C.   The Court Should Deny Myriad's Bid to Transfer This Case to Utah

In the alternative, Myriad asks this Court to transfer this action to its "home court" in Utah.   In order to meet its burden of demonstrating that transfer is warranted under 28 U.S.C. § 1404, Myriad must provide concrete specifics of how litigation mechanics would play out with respect to:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of

---

[4] *Cepheid v. Roche Molecular Sys., Inc.*, No. C-12-4411 EMC, 2013 WL 184125 (N.D. Cal. Jan. 17, 2013), consists primarily of parsing a long history of multi-patent licensing correspondence to determine whether an assertion of infringement can be found there.  The remaining authorities cited by Myriad concern cases where—unlike here—there were no current or impending products for the trier of fact to assess.

unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).  "[T]here is a strong presumption in favor of the plaintiff's choice of forum[]," and as such, "[t]he defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."  *Gherebi v. Bush*, 352 F.3d 1278, 1302 (9th Cir. 2003) (internal quotation marks omitted).  Myriad has not identified concretely one single factor of either convenience or fairness that justifies upsetting Counsyl's choice to bring suit in its home forum.

### 1.    Counsyl's choice of forum is entitled to significant deference.

Myriad argues that Counsyl's choice of forum should be given "little weight" if the other convenience factors favor transfer.  This argument is circular, and is not the law—a plaintiff's choice of forum is a particularly strong factor against transfer where the plaintiff has chosen to litigate in its home forum.  *Amini Innovation Corp. v. JS Imps. Inc.*, 497 F. Supp. 2d 1093, 1110 (C.D. Cal. 2007) ("Generally, the fact that a plaintiff has filed suit in the district where it resides is a sufficient connection to accord its choice of forum deference.").

### 2.    Myriad fails to carry its burden to show that transfer would serve the convenience of the parties and witnesses.

It is well established that in order to show that the convenience of its witnesses favors transfer, the "defendant must name the witnesses it wishes to call, the anticipated areas of their testimony and its relevance, and the reasons why the present forum would present a hardship to them."  *Bohara v. Backus Hosp. Med. Benefit Plan*, 390 F. Supp. 2d 957, 963 (C.D. Cal. 2005).  *See also Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., L.L.C.*, No. C-06-4693 (JCS), 2006 WL 3290416, at *7 (N.D. Cal. Nov. 13, 2006) ("Although Swanson offers a list of 'critical' witnesses who reside in the Northern District of Texas, it has provided no explanation of the likely testimony these witnesses would provide.");  *Fireman's Fund Ins. Co. v. National Bank for Coops.*, No. C 92-2667 BAC, 1993 WL 341274, at *4 (N.D. Cal. Aug. 27, 1993) ("The movant is obligated to clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony would have included") (internal quotation marks omitted).

1  Myriad's conclusory statement that "nearly all of the relevant witnesses are located in Utah,"

2  Mot. 15:4, falls well short of this burden.  The only specific individuals Myriad identifies are five out of

3  the twenty-eight inventors of the patents-in-suit who are, "to the best of Myriad's knowledge," located in

4  Utah.  Myriad does not claim that any of these individuals would be unable or unwilling to travel to

5  California to testify if necessary, and available evidence suggests they would.  Indeed, at least one of the

6  five individuals (Dmitry Pruss) is a current employee of Myriad, *see* Declaration of Daralyn J. Durie

7  ("Durie Decl.") ¶ 3, who can be compelled to testify.  *Amini*, 497 F. Supp. 2d at 1111 ("The court

8  accords less weight to the inconvenience of party witnesses, as they can be compelled to testify

9  regardless of the forum in which the lawsuit is ultimately litigated.") (emphasis removed).  Another

10  inventor, Mark Skolnick, is a founder of Myriad and previously served as Myriad's Chief Scientific

11  Officer.  Durie Decl. ¶ 5.  Mr. Skolnick served on Myriad's Board of Directors until 2010, and thereafter

12  remained with the company on a part-time basis.  *Id.*  Myriad does not provide any reason to believe he

13  would be unwilling to travel to California, especially given that he appears to own property here.  Durie

14  Decl. ¶ 6.  A third inventor, Donna M. Shattuck, is a former Myriad executive who continued to be

15  involved in the lawsuit against Myriad in New York, even after she had left Myriad.  *Id.* ¶ 4; Shattuck

16  Decl. Supp. Defs.' Mot. Summ. J. ¶ 2, *Ass'n for Molecular Pathology v. USPTO*, No. 09 Civ. 4515

17  (RWS) (S.D.N.Y. Dec. 23, 2009), ECF No. 171.

18  Myriad's proposed forum would merely shift any inconvenience to its smaller rival, San

19  Francisco-based Counsyl, as well as other likely third-party witnesses located in California.  But "[i]f the

20  gain to convenience to one party is offset by the added inconvenience to the other, the courts have denied

21  transfer of the action."  *STX, Inc. v. Trik Stik, Inc.*, 708 F. Supp. 1551, 1556 (N.D. Cal. 1988).

22  Counsyl's headquarters, all of its research facilities, all of the records relating to its development

23  of its BRCA test, all of its engineers, and all of its relevant records are located here.  The test was

24  designed, developed, tested, and refined entirely at Counsyl's South San Francisco facilities, by

25  personnel (with the sole exception of a programmer in Poland) located here.  By contrast, Counsyl has no

26  facilities, employees, or sales representatives in Utah.  It has made no offers of sale, let alone sales of the

27  BRCA test, in Utah.  It has, in short, zero relevant contact with Utah.

28

Moreover, at least two non-employee inventors of some of the patents-in-suit—Alexander (Sasha) Kamb and Sheri Jon Olson—are located in California, and could thus be compelled to testify in California but not in Utah.  Durie Decl. ¶¶ 7-8.  The remaining inventors appear to be scattered throughout the United States, Canada, Japan, and Europe.  *Id*. ¶ 9.  For these individuals, San Francisco would be a more convenient venue than Utah.  For example, there are over a dozen non-stop flights per day from Boston (where a number of inventors appear to reside) to San Francisco, but only one to two flights per day from Boston to Salt Lake City.  *Id*. ¶ 10.  There are twenty direct flights from the Washington, D.C. area to San Francisco, but only four to six direct flights each day from the Washington, D.C. area to Salt Lake City.  *Id*.

Additionally, there are important prior art witnesses who reside in California.  For example, the '379 Patent cites a single U.S. patent as a reference (No. 4,683,195), and at least five of the named inventors on that patent (Kary Mullis, Henry Erlich, Norman Arnheim, Randall Saiki, and Stephen Scharf) appear to reside in California.  *Id*. ¶ 11.

Given that "[t]he convenience of the witnesses is often the most important factor in determining whether a transfer under § 1404 is appropriate," *Amini*, 497 F. Supp. at 1111, this Court should deny Myriad's Motion to Transfer based on this failure alone.

### 3. The interests of justice would be served by keeping the case in this District.

Myriad's transfer argument hinges largely on the existence of suits brought by Myriad in the District of Utah against other companies concerning different products.  But Myriad fails to explain how the existence of those recently-filed cases translate into judicial efficiencies great enough to warrant disrupting Counsyl's choice to sue in its home forum and the inconvenience it would pose to Counsyl and many of the likely witnesses in this case.

First, the various lawsuits Myriad has filed in Utah involve separate and unrelated defendants and separate and distinct products.  Courts around the country routinely deny transfer motions in cases like this one where there is a pending litigation in another jurisdiction that involves different parties, products, or claims at issue.  *See, e.g.*, *Interwoven, Inc. v. Vertical Computer Sys., Inc*., No. C 10-4645 RS, 2011 WL 1642250, at *5 (N.D. Cal. May 2, 2011) (holding even if cases were "related," this was insufficient to justify a transfer because "the question of whether each defendant's product infringes Vertical's

intellectual property rights requires individual assessment, thereby reducing the chance or danger of inconsistent results"); *Boston Scientific Corp. v. Johnson & Johnson Inc.*, 532 F. Supp. 2d 648, 655-56 (D. Del. 2008) (denying transfer to the District of New Jersey where the pending litigation involved the same patents and products, but different parties); *ConnecTel, LLC v. Cisco Sys., Inc.*, No. 2:04-CV-396, 2005 WL 366966, at *3 (E.D. Tex. Feb. 16, 2005) (denying motion to transfer where one of the patents at issue had been construed in the prospective transferee court, and the case "involve[d] a different defendant and different products.").

Second, the Utah court's limited experience with Myriad's patents is not substantial enough to warrant transfer based on judicial economy. Claim construction has not occurred, and the case is still at the preliminary injunction stage. Indeed, just a few months ago Myriad admitted that the Utah court was likely to be unfamiliar with the technology involved. Pls.' Mem. Supp. Overlength Mot. Prelim. Inj. at 2. The judicial efficiencies gained by transfer would thus be minimal, at best, and courts routinely deny transfer to courts whose experience with a related technology is similarly limited. *See, e.g.*, *Children's Network, LLC v. PixFusion, LLC*, 722 F. Supp. 2d 404, 415 (S.D.N.Y. 2010) ("The fact that PixFusion initiated patent infringement litigation in the Eastern District of Texas involving other parties and other products does not entitle it to litigate all disputes concerning those same patents in that forum. In other words, PixFusion cannot use the Texas action as a magnet to attract other cases.") (internal citation omitted); *MedImmune, LLC v. PDL BioPharma, Inc.*, No. 08-5590 JF (HRL), 2009 WL 1011519, at *3 (N.D. Cal. Apr. 14, 2009) (finding that the concern for judicial economy does not weigh in favor of transfer where the first filed court had only issued a claim construction order); *J2 Global Commc'ns, Inc. v. Protus IP Solutions*, *Inc.*, No. 6:08-cv-211, 2008 WL 5378010, at *5 (E.D. Tex. Dec. 23, 2008) (finding transfer based on other suits inappropriate "when a court has had limited involvement with the case and the technology, no claim construction opinion has issued, and the cases involve different defendants with different products.").

Finally, the relevant congestion of the two courts favors keeping this case here, in a District with local patent rules and extensive experience with patent cases. In Myriad's Utah lawsuit against Ambry, at a July 29, 2013 hearing, the presiding judge explained the court was "still chewing through a case load we inherited last October" and "hearing right now motions that were filed in about October or November

---

16

1   last year."  Mot. Hr'g Tr. 4:8-11, *Univ. of Utah Research Found. v. Ambry Genetics Corp.*, No. 2:13-cv-

2   00640-RJS (D. Utah July 29, 2013), ECF No. 31.  Thus, there is little reason to believe that judicial

3   economy would be served by transferring this action to a court that is just beginning to familiarize itself

4   with the patents and is dealing with a congested docket.

5       **4.    The court most familiar with the issues is in New York, not Utah.**

6       In the alternative, if the Court is inclined to accept Myriad's position that the paramount interest

7   is prior judicial experience with the patents, Counsyl submits that the case should be transferred to the

8   Southern District of New York, where Judge Sweet has been presiding over Myriad's case involving the

9   same patents for nearly five years.  *Ass'n for Molecular Pathology v. USPTO*, No. 09 Civ. 4515

10   (S.D.N.Y. filed May 12, 2009).  Judge Sweet is intimately familiar with the legal issues as well as the

11   patents and technology, including having issued rulings on motions to dismiss, for judgment on the

12   pleadings, and summary judgment.  Judge Sweet's ruling on summary judgment was appealed to the

13   Federal Circuit and the United States Supreme Court, *Ass'n for Molecular Pathology v. Myriad Genetics,*

14   *Inc.*, 133 S. Ct. 2107 (2013), and proceedings in that case presumably will resume in Judge Sweet's court

15   once the Federal Circuit's mandate issues.  Thus, if the determinative factor is judicial efficiency and

16   experience, the case should be transferred to New York, not Utah.

17       **D.    The Complaint States a Claim for Noninfringement**

18       Finally, Myriad seeks dismissal of Counsyl's noninfringement claims on Rule 12(b)(6) grounds.

19   That motion should be denied, as Counsyl has done all that notice pleading requires:  It has provided

20   sufficient factual allegations to put Myriad on adequate notice to as to what it must defend in this action.

21   Just as a plaintiff asserting infringement is not required to allege in detail every potentially infringing

22   product or process, a "declaratory judgment claim of no direct infringement need only plead facts to put

23   the patentee on notice and need not be subject to the heightened pleading standards of *Twombly*

24   and *Iqbal*."  *Microsoft Corp. v. Phoenix Solutions, Inc.*, 741 F. Supp. 2d 1156, 1159 (C.D. Cal. 2010).

25   Patent infringement pleading—whether affirmative or declaratory—is governed by Form 18 of the

26   Federal Rules of Civil Procedure.  *Id.* ("[I]t would be incongruous to require heightened pleading when

27   the pleading standard for infringement does not require facts such as 'why the accused products allegedly

28   infringe' or 'to specifically list the accused products'"); *accord Alien Technology Corp. v. Intermec, Inc.*,

17

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD

1   No. 3:06-cv-51, 2007 WL 63989, at *7 (D.N.D. Jan. 4, 2007) (finding that the accused infringer had

2   sufficiently pled a declaratory judgment claim where it "reference[d] . . . the technology protected by the

3   patents in issue.").  *See also Cordance Corp. v. Amazon.com, Inc.*, 521 F. Supp. 2d 340, 345 (D. Del.

4   2007) (Rule 8 held not to require defendant to "identify, in its counterclaim, specific products by name,

5   so long as they are sufficiently described in some way.").  Myriad, as the patentee, carries the burden of

6   proof on infringement, regardless of procedural posture, *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d

7   1551, 1557 (Fed. Cir. 1987) ("The burden is always on the patentee to show infringement"), and it would

8   be incongruous to impose on Counsyl a higher pleading standard than would be imposed on Myriad had

9   Counsyl waited for that day to come.  *Accord Phoenix Solutions*, 741 F. Supp. 2d at 1159; *Elan Pharma

10  Int'l Ltd. v. Lupin Ltd.*, No. 09-1008 (JAG), 2010 WL 1372316, at *5 (D.N.J. Mar. 31, 2010) ("There is

11  no basis for this Court to, on the one hand, allow Elan to plead as it has while, on the other hand, require

12  Lupin, inexplicably, to provide more detailed factual support for its counterclaims and defenses.").

13  Counsyl's Complaint alleges that it seeks a declaration of noninfringement with respect to its genetic

14  tests and services that use the *BRCA1* and/or *BRCA2* genes, such as the sequencing and analysis of those

15  genes.  Compl. ¶ 12.  Nothing more is required under Rule 8, which requires only "'a short and plain

16  statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair

17  notice of what the . . . claim is and the grounds upon which it rests.'"  *McZeal v. Sprint Nextel Corp.*, 501

18  F.3d 1354, 1356 (Fed. Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

19  Counsyl's allegations are significantly more concrete than those the court held insufficient in the case

20  cited by Myriad, *ASUSTeK Computer Inc. v. AFTG-TG LLC*, No. 5:CV 11-00192-EJD, 2011 WL

21  6845791, at *2, 13 (N.D. Cal. Dec. 29, 2011).  In *ASUSTeK*, the complaint referred broadly to "computer

22  chips, motherboards, computers and other products" but failed to describe any product such that it was

23  impossible to adjudicate an infringement claim.  *Id.* at *13-14.  In contrast to *ASUSTeK*, Counsyl has

24  provided Myriad with "fair notice of what the claim is and the grounds upon which it rests" in a manner

25  sufficiently concrete to enable Myriad to understand and frame a defense to Counsyl's noninfringement

26  claim.

27      Finally, in the event the Court finds Counsyl's pleading insufficiently detailed, Counsyl requests

28  leave to amend its complaint accordingly.  "Dismissal without leave to amend is improper unless it is

1   clear, upon de novo review, that the complaint could not be saved by any amendment."  *Gompper v.*

2   *VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472

3   (9th Cir. 1991)).  As Myriad's sole asserted basis for dismissal is that Counsyl has not included sufficient

4   detail about its own product, that purported defect could of course be cured by amendment.

5

6   Dated:  December 6, 2013                           DURIE TANGRI LLP

7

8                                                By: _____*/s/ Daralyn J. Durie*_____
                                                       DARALYN J. DURIE
9                                                      MARK A. LEMLEY
                                                       TIMOTHY C. SAULSBURY
10
                                                 Attorneys for Plaintiff
11                                               COUNSYL, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF COUNSYL, INC.'S OPPOSITION TO DEFENDANT MYRIAD GENETICS, INC.'S MOTION
TO DISMISS OR TRANSFER / CASE NO. 5:13-CV-04391-EJD